1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11   CALIFORNIA HOSPITAL
     ASSOCIATION,
12                                   Civ No. 10-3465 FCD/EFB
            Plaintiff,
13
        v.                           MEMORANDUM AND ORDER
14
     DAVID MAXWELL-JOLLY, Director
15   of the California Department
     of Health Care Services,
16   CALIFORNIA DEPARTMENT OF
     HEALTH CARE SERVICES,
17
            Defendants.
18                        ----oo0oo----

19       This matter is before the court on plaintiff California

20   Hospital Association's ("plaintiff" or "CHA") motion for

21   preliminary injunction.  CHA seeks an order enjoining defendants,

22   California Department of Health Care Services ("DHCS") and the

23   Director thereof (sometimes collectively, "defendants"), from

24   continuing to implement California Welfare & Institutions Code

25   § 14105.281 ("Section 14105.281").  Section 14105.281, adopted by

26   the California Legislature in October 2010, freezes the rates at

27   which California reimburses hospitals providing inpatient Medi-

28   Cal services to the lesser of the rates paid on January 1, 2010

                                 1

1   or July 1, 2010 (sometimes referred to generally herein as the

2   "Rate Freeze").

3       Plaintiff contends that it is likely to succeed on the

4   merits of this case for several alternative reasons: (1) the

5   implementation of the Rate Freeze violates the Contract Clauses

6   of the United States and California Constitutions; CHA contends

7   that the "Rate Freeze will prevent impacted hospitals from

8   receiving any increased reimbursement . . . they otherwise would

9   have been entitled to . . . under their contracts with the [DHCS]

10  or, in the case of non-contract hospitals, under the

11  reimbursement methodology set forth in the Medi-Cal Regulations."

12  (Dauner Decl., filed Jan. 27, 2011 [Docket # 14], Attachment 7

13  ¶ 6); (2) plaintiff contends defendants have violated federal law

14  because DHCS, which administers the Medi-Cal program, enacted

15  amendments to the state Medi-Cal plan without receiving prior

16  federal approval; and (3) plaintiff alleges that the federal

17  Medicaid Act preempts the Rate Freeze because, prior to

18  enactment, DHCS failed to comply with 42 U.S.C.

19  §§ 1396a(a)(13)(A) ("Section 13(A)") and (30)(A) ("Section

20  30(A)") which require that any change in reimbursement be

21  preceded by specific comment and notice procedures and that the

22  change be based upon responsible cost studies.

23      Moreover, plaintiff contends that an injunction is proper

24  because if DHCS is not enjoined from implementing the freeze, it

25  will be irreparably harmed.  Specifically, plaintiff contends it

26  will be irreparably harmed because the Eleventh Amendment bars

27  any action against DHCS to recoup the Medi-Cal reimbursements its

28  member hospitals would have received but for the Rate Freeze.

2

1  Finally, plaintiff asserts that the balance of hardships and the
2  public interest weigh in its favor because defendants' stated
3  purpose for enacting the freeze is not a sufficient justification
4  for impairing Medi-Cal hospitals' contracts with the State.

5      Defendants oppose the motion on numerous procedural and
6  substantive grounds.  First, defendants claim that since the
7  freeze was enacted to facilitate the development of a more
8  efficient Medi-Cal reimbursement system, the State's police power
9  to protect the public health permits it to impair the contracts
10  in question.  More specifically, defendants argue that the Rate
11  Freeze is necessary because, in order to implement a new proposed
12  methodology for establishing reimbursement rates, DHCS requires
13  static reimbursement rate figures.  Defendants also assert that,
14  because hospitals will receive supplemental payments during the
15  temporary freeze, the statute does not "substantially impair" any
16  contracts, and thus, the Contract Clauses are inapplicable.

17      Defendants also contend that plaintiff's claim for failure
18  to obtain federal approval of the Rate Freeze is not cognizable
19  because Congress did not create a private right of action to
20  enforce the federal approval provisions.  Moreover, defendants
21  assert that, even if the claim is cognizable, federal law does
22  not actually require prior federal approval before the Rate
23  Freeze may be implemented and asks this court to reconsider its
24  recent holding to the contrary in Cal. Ass'n of Rural Health
25  Clinics v. Maxwell-Jolly, Civ. No. S-10-759 FCD/EFB, 2010 WL
26  4069467 (E.D. Cal. Oct. 18, 2010) ("CARHC").

27      Similarly, defendants maintain that plaintiff's claim under
28  Section 30(A) is procedurally improper because Congress did not

3

1  create a private right to enforce that provision.  Defendants

2  also argue that, even if Section 30(A) is privately enforceable,

3  plaintiff lacks standing to bring this action on behalf of its

4  member hospitals.  Defendants also claim that, since the language

5  of the statute vests DHCS with the authority to determine whether

6  the Rate Freeze complies with federal Medicaid mandates, and DHCS

7  determined that it does, plaintiff's claim under Section 30(A) is

8  not viable.  Lastly, with regard to both plaintiff's federal

9  approval and Section 30(A) claims, defendants ask the court to

10  invoke the doctrine of primary jurisdiction, deferring the

11  determination of whether implementation of the Rate Freeze

12  complies with the federal Medicaid Act to the agency

13  administering the Medicaid program--DHCS in this instance.

14  Defendants further assert that, by providing public notice of the

15  proposed Rate Freeze via the California Regulatory Notice

16  Register, they complied with the notice and comment procedures

17  required by Section 13(A).

18      Defendants contend that not only is plaintiff unlikely to

19  succeed on the merits of any of its claims, but a preliminary

20  injunction is also improper in this instance because plaintiff

21  cannot show that it is likely to suffer irreparable harm.

22  Defendants allege that, regardless of the Rate Freeze, both

23  contract and non-contract hospitals will eventually recoup more

24  than 100 percent of their allowable costs.  Moreover, defendants

25  contend that plaintiff will not suffer irreparable harm because

26  the Rate Freeze will not affect any supplemental payments certain

27  hospitals may receive pursuant to various statutes.  Finally,

28  defendants argue that the balance of hardships and public

4

interest weigh in defendants favor because any injunction of the Rate Freeze will impair defendants ability to develop a more efficient Medi-Cal reimbursement methodology.

The court heard oral argument on the motion on February 25, 2011.[1]  By this order it now renders its decision granting plaintiff's motion for a preliminary injunction, thereby enjoining the State's further implementation of Section 14105.281.

**BACKGROUND**

## 1.   **The Parties**

CHA represents approximately 450 California hospitals that provide both inpatient and outpatient services. (Duaner Decl. ¶ 3.)  Almost all of CHA member hospitals provide those services to California Medi-Cal beneficiaries. (Id.)  CHA brings this action on behalf of its members to prevent DHCS from implementing the Rate Freeze, which CHA contends will "directly and adversely" affect its member hospitals. (Id. ¶¶ 3-4.)  DHCS is the state agency charged with administering California's Medicaid Program, known as the California Medical Assistance Program ("Medi-Cal"). As the sole state agency responsible for the Medi-Cal program, DHCS must establish and administer a state Medi-Cal plan. 42 C.F.R. § 430.12; Cal. Welf. & Inst. Code § 14081 *et seq* (West 2010).  Additionally, DHCS is responsible for reimbursing hospitals that render services to Medi-Cal beneficiaries in compliance with the State Plan and with federal and state laws

---

[1]   At the close of oral argument, the parties stipulated to extending the temporary restraining order, which terminated on February 25, to the date the order on the motion for preliminary injunction issues.

and regulations.   42 C.F.R. §§ 431.1, 431.10.

In its capacity as administrator of the state Medi-Cal plan, DHCS determined that the freeze complied with federal Medicaid law and began implementing the Rate Freeze in January, 2011. (Defs.' Mot. for Clarification, filed Feb. 2, 2011 [Docket # 21], at 3:7-23.).  As part of the implementation, DHCS began updating its Provider Master File to reflect the Rate Freeze, which entails updating 30-40 codes for each hospital. (<u>Id.</u> at 3:17-23.)

On January 28, 2011, the Honorable Lawrence K. Karlton[2] issued a temporary restraining order, enjoining DHCS from implementing the Rate Freeze. (<u>Id.</u> at 2:1-9.)  Because DHCS began updating its Provider Master File prior to the issuance of the restraining order, it filed a motion for clarification to determine whether the injunction was prohibitory, requiring only that DHCS maintain the status quo at the time of the order, or mandatory, requiring DHCS to reverse the changes it made to its Master Provider List. (<u>Id.</u> at 7:1-6.)  On February 4, 2011, Judge Karlton granted defendants' request for clarification, holding that the temporary restraining order is prohibitory, and thus, DHCS was not required by the order to make any changes to its Provider Master File. (<u>See</u> Order Granting Defs.' Req. for Clarification, filed Feb. 4, 2011 [Docket #23].)  Judge Karlton clarified that defendants were obligated to reimburse plaintiff's members at the unfrozen reimbursement rate for dates of service on or after January 28, 2011 (the date of the court's TRO order).

---

[2]      The temporary restraining order was issued by Judge Karlton because the undersigned was unavailable at the time.

(Id.)

Plaintiff now moves for a preliminary injunction, asking this court to enjoin further implementation of Section 14105.281 and direct that defendants reverse the previously made changes to the Master Provider List so that plaintiff's member hospitals are reimbursed at the non-frozen rates for dates of service following the statute's enactment in October 2010.

**2.   Statutory Background**

   **a.   Federal Medicaid Law**

Title XIX of the Social Security Act (the "Medicaid Act") establishes a cooperative federal-state program that provides federal funding to states that choose to provide medical assistance to low-income persons.  Medicaid is jointly financed by federal and state governments and administered by the states through the State Plan, which must receive approval from the Secretary for Health and Human Services ("Secretary"). 42 U.S.C. § 1396a.  As a condition of receiving federal funding, Medi-Cal must cover certain enumerated services, including inpatient and outpatient services.  Id. § 1396a(a)(10)(A)(i)(I)- -(VII).  Moreover, in exchange for federal funds, participating states must comply with federal Medicaid laws and regulations. Id. § 1396c; see also 42 C.F.R. § 430.35.  One of the chief requirements is that the State must establish and comply with the State Medicaid plan.  42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 430.10

"The State [P]lan is a comprehensive written statement . . . describing the nature and scope of [the State's] Medicaid program and [assuring the Plan] will be administered in conformity with the . . . requirements of [federal Medicaid law]."  42 C.F.R. §§

430.10; see also 447.252(b).  In establishing the State Plan, the Medicaid Act requires the State to establish reimbursement rates for inpatient services through a public process that includes: (a) publication of proposed rates, the methodologies underlying the establishment of such rates and justification for the rates; (b) an opportunity for the public to comment on the proposed rates and their justifications; and (c) publication of the final rates, the methodology underlying their establishment and the justification for the final rates.  42 U.S.C. § 1396a(a)(13)(A). Moreover, prior to establishing reimbursement rates, federal Medicaid law requires states to consider responsible cost studies to ensure rates will be reasonably related to provider costs.  42 U.S.C. § 1396a(a)(30)(A);[3] Orthopaedic Hosp. v. Belshe, 103 F.3d 1491, 1497 (9th Cir. 1997)[4] (requiring states to consider responsible cost studies, its own or others, prior to setting provider compensation rates and directing that in considering providers' costs, hospital rates should bear a reasonable relationship to an efficient and economical hospital's costs in

---

[3]    Section 30(A) requires states "to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."

[4]    The United States Supreme Court has recently granted certiorari to determine whether private parties may sue under the Supremacy Clause to enforce 42 U.S.C. § 1396a(a)(30)(A).  See Indep. Living Ctr. of S. Cal. v. Maxwell-Jolly, 572 F.3d 644 (9th Cir. 2009) ("ILC II"), cert. granted in part by Maxwell-Jolly v. Indep. Living Ctr. of S. Cal., Inc., 2011 WL 134273 (U.S. Jan. 18, 2011); Cal. Pharm. Ass'n v. Maxwell-Jolly, 596 F.3d 1098, 1107 (9th Cir. 2010) ("Cal. Pharm. II"), cert. granted in part by Maxwell-Jolly v. Cal. Pharm. Ass'n, 2011 WL 134273 (Jan. 18, 2011).

8

providing quality care).

When a state seeks to make changes to its approved State Plan, it must submit a State Plan Amendment ("SPA") to the Centers for Medicare and Medicaid Services ("CMS") so CMS may determine whether the amended State Plan continues to comply with federal regulations.   42 C.F.R. § 430.12(c).   CMS may approve or disapprove of the amendment, or it may request more information before making a determination.   Id. § 430.16(a).   Any amendment to the State Plan, including changes in the methodology for determining reimbursement rates, cannot be implemented until the amendment has been approved by CMS.   Id. §§ 430.20(b)(2), 447.256(c); see also Exeter Memorial Hosp. Ass'n v. Belshe, 145 F.3d 1106 (9th Cir. 1998); CARHC, 2010 WL 4069467.   If CMS fails to act upon a submitted amendment within 90 days, the amendment is deemed approved.   42 C.F.R. § 430.16.   A request for more information, however, stops the 90-day clock.   Id. §§ 430.16(a)(2), 447.256(b).

Here, DHCS submitted the proposed amendment of the State Plan to CMS on September 30, 2010.   (Keville Decl., filed Jan. 27, 2011 [Docket #14], Attachment 2, ¶ 4 Ex. C)   At oral argument, defendants indicated that CMS has requested more information concerning the SPA.   CMS has yet to approve the amendment.   (Defs.' Opp'n to Mot. for P.I. [Opp'n], filed Feb. 10, 2011 [Docket # 25], at 3:11-12.)

    b.   **California's Medi-Cal Program**

In California, DHCS is required to administer Medi-Cal in accordance with the State Plan, state law and Medicaid Regulations.   Cal. Code Regs. tit. 22, § 50004(b) (2010).

9

Reimbursement rates for services rendered by hospitals to Medi-Cal beneficiaries are determined by one of two methods, depending on whether the specific hospital has an express contract with DHCS.  Where an express written contract exists between DHCS and the hospital ("contract hospital"), the reimbursement rates are governed by the express terms of the contract.  When a hospital renders inpatient services to a Medi-Cal beneficiary, but does not negotiate a written contract with DHCS ("non-contract hospital"), the reimbursement rate is established in accordance with a formula set forth in Medi-Cal regulations and California's State Plan.  In California, there are approximately 173 contract hospitals and over 250 non-contract hospitals.  (Sands Decl., filed Feb. 10, 2011 [Docket # 27], ¶¶ 5-6.)

Contracts between hospitals and DHCS are confidentially negotiated by the California Medical Assistance Commission ("CMAC").  Cal. Welf. & Inst. Code §§ 14082, 14082.5 (West 2010).  While a hospital's status as a Medi-Cal contractor is public knowledge, the contract terms controlling reimbursement rates are not subject to public disclosure.[5]  Cal. Gov't Code § 6254(q) (West 2010).  Contract hospitals are reimbursed at the negotiated rate per patient per day ("per diem").  (Zaretsky Decl., filed Jan. 27, 2011 [Docket #14], Attachment 6, ¶ 11.)  Contract hospitals often negotiate contract amendments with CMAC to

---

[5]     Since the terms of the contracts between DHCS and hospitals that provide Medi-Cal services are confidential, the court granted plaintiff's motion to seal certain declarations which revealed the rates at which the specific hospitals are reimbursed pursuant to their contracts with the State. Defendants did not oppose plaintiff's motion.  (See Pl.'s Req. to Seal Documents, filed Jan. 28, 2011 [Docket #18].)

increase reimbursement rates at a future date.  (Id. ¶ 13.)  "For example, some providers agree to a one-time increase in their per diem rate to take effect on a date certain, as specified in a contractual amendment."  (Id.)  Prior to the enactment of the Rate Freeze, hospitals "had the option to discontinue the contract after a specific notice period."  (Id. ¶ 14.)  Non-contract hospitals "are paid for inpatient services based on the lesser of the hospital's reasonable costs," which is "based on a complex formula that serves as a limit on allowable reimbursement."  (Id. ¶¶ 7, 9.)

California's selective provider contracting program ("SPCP"), which governs contract negotiations between DHCS and hospitals offering services to Medi-Cal beneficiaries, has been carried out pursuant to a waiver of certain Medicaid Act requirements, as approved by CMS pursuant to 42 U.S.C § 1315(a)(1).  This waiver is accompanied with certain special terms and conditions, such as: the State must continue to comply with all applicable Medicaid requirements that were not waived; and, changes to the SPCP must be approved by CMS and go through the requisite public process prior to implementation.  (Keville Decl. Ex. A at 9.)  To this end, any change in "[r]eimbursement methodologies affecting . . . the Medicaid State Plan" must go through the public process and be approved by CMS.  (Id.)

### c.   Implementation of the Rate Freeze

Plaintiff had actual notice of the proposed Rate Freeze on May 26, 2010, when it opposed the proposed freeze at a state Senate Budget Committee hearing.  (Hutonhill Decl., filed Feb. 10, 2011 [Docket # 25], Attachment 3, ¶ 5, Ex. B.)  Subsequently,

defendants provided public notice of the proposed freeze on at least four occasions.  First, on June 25, 2010, DHCS, via its website and the California Regulatory Notice Register ("Register"), gave a preliminary notice regarding the proposed Rate Freeze.  (Sands Decl. ¶ 19, Ex. B.)  According to the notice, the freeze was intended to go into effect on July 1, 2010.  (<u>Id.</u>)  The notice informed the public that it had until June 29, 2010 to submit comments concerning the proposed Rate Freeze.  (<u>Id.</u>)

On October 8, 2010, the Legislature passed ("SB 853"), which added Section 14105.281 to the California Welfare and Institutions Code.  On October 19, 2010, the Governor signed SB 853, enacting the Rate Freeze.  It should be noted that, since SB 853 was a budget trailer bill,[6] there is no documented legislative history or intent available.  Therefore, the only documentation this court has to rely on is the language of the bill itself and the notices posted by DHCS concerning the Rate Freeze.[7] Importantly, the first notice posted by DHCS stated that the Rate Freeze was necessary solely for budgetary reasons; specifically, to "generate savings to the State General Fund and operations

---

[6]     "'Budget trailer bills' include [only] provisions necessary to implement the decisions made on budget negotiations" which are conducted outside the normal legislative process.  (Declaration of Jan Raymond ["Raymond Decl."], filed Jan. 27, 2011 [Docket #14], ¶ 7.)  "Along these lines, SB 853 was used to implement amendments necessary to carry out the budget compromise reached after the longest budget stalemate in California history, which ended in late Fall 2010."  (<u>Id.</u>)

[7]     "At this point virtually no documentation exists that discusses the purpose or intent of the various provisions of the bill other than the floor analyses that provide an overview at best."  (<u>Id.</u> Ex. A.)

12

efficiencies" and to "contribute to reducing and stabilizing the payments to hospitals for impatient services."  (Pl.'s Req. for Judicial Notice ["RJN"], filed Jan. 27, 2011 [Docket #14], Attachment 10, Ex. B.)  There was no mention, whatsoever, of the proposed implementation of a DRG-based methodology until the Legislature amended SB 853 on October 7, *a day before* the Legislature passed the measure.  (See Raymond Decl., Ex. B at 2, 8-37.)

On November 19, 2010, DHCS, via the Register, posted further notice regarding implementation of the freeze.  (Sands Decl. ¶ 19, Ex. C.)  On January 18, 2011, DHCS posted on its website a "detailed description of the precise methodology to be implemented by DHCS for both contract and non-contract hospitals."  (Id. at Ex. D.)  Finally, on January 28, 2011 DHCS gave a final public notice of the Rate Freeze in the Register.  (Id. at Ex. E.).  In addition to the various public notices, on January 20, 2011, DHSC mailed a letter to all contract and non-contract hospitals describing the methodology underlying the Rate Freeze.  (Id. ¶ 20, Ex. F.)

The terms of Section 14105.281 make a number of fundamental changes to the current Medi-Cal system.  First, the "recital" states that the purpose of the freeze is to facilitate implementation of a new system for reimbursement--a diagnosis related groups[8] or "DRG"-based system.  Cal. Welf. & Ins. Code

---

[8]   A separate statute enacted through SB 853, Welfare & Institutions Code § 14105.28 describes the methodology underlying the DRG-based system.  Since the specific methodology is irrelevant to the disposition of this motion, the court does not address the particular aspects of the DRG-based system.

§ 14105.281(a)(1) (West 2010).  Second, the Rate Freeze itself

limits reimbursement rates to the lesser of the rates paid on

January 1, 2010 or July 1, 2010 until the DRG-based system is

fully implemented.  Id. § 14105.281(c)(1).  The statute itself

does not provide a specific date for termination of the Rate

Freeze; it shall continue "to the extent that the rates, alone or

in combination with any available supplemental payments, are

consistent with federal law."  Id. § 14105.281(a)(3).  The freeze

nullifies any rate adjustment provision in contracts between DHCS

and hospitals providing Medi-Cal services if the provision

conflicts with the terms of the Rate Freeze.  Id. §

14105.281(c)(3).  Third, if a contract hospital exercises its

rights to terminate its contract with DHCS, it will still be paid

at the frozen rates, not as a non-contract hospital, as was the

case prior to implementation of the Rate Freeze.  Id. §

14105.281(c)(2).  The statute also provides for reconciliation of

payments, but only at the rate that would have been paid had the

new DRG-based system been in place as of July 1, 2010, not at the

rates contracted for.  Id. § 14105.281(f).  In other words, the

statute requires DHCS to reimburse hospitals at the rate

established by the DRG-based system for all inpatient services

rendered between the enactment of the freeze and the date the

DRG-based system goes into effect.  The court will refer herein

to the various provisions of Section 14105.281 collectively as

the "Rate Freeze."

14

In January 2011, defendants conducted a study[9] "to evaluate whether Medi-Cal reimbursement paid for hospital inpatient services during the freeze in rates will comply with title 42 United States Code section 1396a(a)(30)(A)." (Douglas Decl., filed Feb. 10, 2011 [Docket #27], Attachment 1, Ex. A at 1.) After providing background information concerning California's Medi-Cal system and the enactment of the Rate Freeze, the study surveyed the relatively large body of Ninth Circuit and California case law interpreting Section 30(A) for purposes of analyzing whether the Rate Freeze complies with that provision. (Id. at 7-10.)  The study then addresses the potential fiscal impact of the Rate Freeze.  (Id. at 11-15.)  It ultimately concludes that Section 14105.281 complies with Section 30(A) because: (1) even if supplemental payments are not considered, "reimbursement [levels] will comply with the reasonable cost based standard that the Ninth Circuit has adopted for section 1396a(30)(A)" and (2) Medi-Cal beneficiaries "will continue to have sufficient access to hospital inpatient services." (Id. at 14, 17.)

The January 18, 2011 notice posted by DHCS explained the methodology that would be used to apply the Rate Freeze to non-contract hospitals.  (Sands Decl. ¶ 19, Ex. D.)  The notice also alerted the public that the freeze nullifies any rate increase due under the terms of Medi-Cal contracts.  (Id.)  The freeze is set to begin impacting actual reimbursement for any claims

---

[9]     The study was concluded and signed on January 18, 2011, the same day DHCS posted the notice described below and began updating its Master Provider File.  (Phelps Decl., filed Feb. 2, 2011 [Docket #21], Attachment 2, ¶ 5.)

processed after January 31, 2011. (<u>Id.</u>)  DHCS, however, also intends to retroactively reprocess previous claims after the date of the Rate Freeze in order to recoup excess payments made to providers based on the non-frozen rates. (<u>Id.</u>)  Thus, DHCS will reprocess all claims previously paid at the non-frozen rates between July 1, 2010 and the date the Provider Master File is completely updated to reflect the frozen rates. (<u>Id.</u>)

**STANDARD**

A party seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. <u>Winter v. Natural Res. Def. Council, Inc.</u>, 129 S. Ct. 365, 374 (2008)

The Ninth Circuit, in <u>Am. Trucking Assn's Inc. v. City of Los Angeles</u>, 559 F.3d 1046 (9th Cir. 2009), clarified the controlling standard for injunctive relief in light of the United States Supreme Court's decision in <u>Winter</u>.  Pursuant to <u>American Trucking</u>, a party cannot obtain a preliminary injunction "merely because it is possible that there will be an irreparable injury to the plaintiff; it must be likely that there will be." <u>Id.</u> at 1052 (*citing* <u>Winter</u>, 129 S. Ct. at 375–376 (recognizing that issuing a preliminary injunction based solely on a "possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.")).

Traditionally, mere economic damages were not considered irreparable as an injured party may seek corrective relief through litigation.  <u>Sampson v. Murray</u>, 415 U.S. 61, 90 (1974). However, where the party seeking injunctive relief is legally precluded from pursuing damages--for example, if a claim is barred by the Eleventh Amendment--irreparable harm is established.  <u>Cal. Pharm. Assn. v. Maxwell-Jolly</u>, 563 F.3d 847, 852 (9th Cir. 2009) ("<u>Cal. Pharm. I</u>").  Ultimately, because a preliminary injunction is an extraordinary remedy, in each case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  <u>Winter</u>, 129 S. Ct. at 376 (internal quotations and citations omitted).

**ANALYSIS**

Plaintiff's complaint, filed December 27, 2010, alleges the following claims for relief: (1) violation of the Contract Clause of the United States Constitution (first claim); (2) violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (second claim); (3) violation of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A) (third claim); (4) violation of the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A) (fourth claim); (5) violation of 42 C.F.R. § 447.205's notice requirements (fifth claim); (6) failure to amend the State Plan (sixth claim); (7) violation of federal waiver terms and conditions (seventh claim); (8) for a writ of mandate pursuant to California Code of Civil Procedure § 1085 based on the above, alleged violations of law (eighth claim); and (9) for declaratory relief.  Plaintiff moves for a preliminary

17

injunction only on the basis of its first, third, fourth, sixth, seventh and eighth claims for relief.  The court considers these claims below in the order best tailored to the parties' various arguments raised in support of and in opposition to the motion.

**1.    Contract Clause**

In its first and eighth claims for relief, plaintiff alleges the enactment of Section 14105.281 violates the Contract Clauses of the United States and California Constitutions.  (See Pl.'s Mot. for TRO/Prelim. Inj. ["MPI"], filed Jan. 27, 2011, [Docket #17], at 10-15.)  Specifically, plaintiff asserts that the Rate Freeze substantially impairs Medi-Cal contracts between hospitals and the State because "the Rate Freeze by its own terms nullifies any provisions in CMAC contracts that otherwise call for hospitals to receive an increase in their Medi-Cal inpatient payment rates."  (Id. at 13:5-7.)  Moreover, plaintiff contends that the Rate Freeze substantially impairs non-contract hospitals' implied contracts with the State "because it retrospectively imposes a limit on the payment hospitals can receive for services rendered before the statute was created." (Id. at 14:15-16.)

Defendants do not contest either the existence of a contractual relationship or that those contracts will be "impaired" by the Rate Freeze.  Instead, defendants contend that any impairment to the contracts will not be substantial.  (Opp'n at 4:20-5:17.)  Defendants maintain that, even though hospitals will not be reimbursed at contracted rates, the impairment is not substantial because hospitals will still receive supplemental payments, if they are statutorily available.  (Id. at 5:1-6.)

18

Defendants also contend that the State's police power permits it
to impair the contracts in question to protect the public health
and welfare. (Id. at 3:27-4:19.) Defendants assert the Rate
Freeze is necessary to implement the new DRG-based system which,
according to DHCS, will provide a more accurate and efficient
Medi-Cal reimbursement system. (Id. at 6:11-8:21.)

"No state shall . . . pass any . . . Law impairing the
Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1.[10]  To
determine whether the Rate Freeze violates the Contract Clause,
the court must determine: (1) whether the Rate Freeze operates as
a substantial impairment to the specific terms of the State's
contracts with hospitals providing Medi-Cal services and (2) if
the plaintiff demonstrates substantial impairment, whether the
defendant can show that the State's police power permits the
impairment because it is "reasonable and necessary to serve an
important public purpose." State of Nevada Employees Ass'n v.
Keating, 903 F.2d 1223, 1226 (9th Cir. 1990) (internal citations
and quotations omitted). The Contract Clause is not an absolute
bar to state regulation that impairs contractual relationships;
instead, "its prohibition must be accommodated to the inherent
police power of the State 'to safeguard the vital interests of
its people.'" Energy Reserves Grp., Inc. v. Kan. Power & Light
Co., 459 U.S. 400, 410 (1983) (quoting Home Bldg. & Loan Ass'n v.

---

[10]      Courts apply the same standard to claims brought under
the Contract Clauses of the United States and California
Constitutions. Campanelli v. Allstate Life Ins., 322 F.3d 1086,
1097 (9th Cir. 2003). Thus, the court's analysis herein
addresses the Contract Clause of the United States Constitution
but it applies equally to plaintiff's claim under the California
Constitution.

Blaisdell, 290 U.S. 398, 434 (1934)).

Normally, courts will defer to the Legislature's judgment in enacting legislation aimed at protecting the public.  United States Trust Co. v. New Jersey, 431 U.S. 1, 22-23 (1977). However, "impairments of a state's own contracts . . . face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 n.15 (1978); see also RUI One Corp. v. City of Berkeley, 371 F.3d 1137, 1147 (9th Cir. 2004) ("Courts defer [to legislative judgment] to a lesser degree when the State is a party to the contract because 'the State's self-interest is at stake.'" (quoting United States Trust Co., 431 U.S. at 25-26)).  In other words, "the Contract Clause is 'especially vigilant when a state takes liberties with its own obligations . . .'"  Univ. of Hawaii Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1105 (9th Cir. 1999) (quoting Ass'n of Surrogates & Supreme Court Reporters v. New York, 940 F.2d 766, 773-74 (2d Cir. 1991)).

### a.   Substantial Impairment

There is no dispute that the Rate Freeze impairs hospitals' contracts with the State--the language of the statute expressly nullifies any contract term that conflicts with the terms of the Rate Freeze.  Cal. Welf. & Ins. Code § 14105.281(a)(1) (West 2010).  Moreover, the Rate Freeze impairs implied contracts between the State and hospitals offering Medi-Cal services without an SPCP contract because it retroactively alters payment rates those hospitals would have received pursuant to the methodology provided in the regulations at the time the freeze

20

was enacted. (See MPI at 14:17-19.) Defendants, however, contend that even though the Rate Freeze impairs hospitals' contracts, it does not *substantially* impair those contracts because: (1) hospitals will receive supplemental payments during the temporary freeze; (2) the impairment will only last until the DRG-based rates are effective; and (3) hospitals should have reasonably expected the State to renege on its obligations to Medi-Cal participating hospitals because the State heavily regulates Medi-Cal. (Opp'n at 5:1-6.) None of defendants' arguments persuade the court.

"An impairment of a public contract is substantial if it deprives a private party of an important right, thwarts the performance of an essential term, defeats the expectations of the parties, or alters a financial term." S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 890 (9th Cir. 2003) (internal citations omitted). Plaintiff submits evidence[11] that contract hospitals individually stand to lose anywhere from 1-10 million dollars each because the Rate Freeze nullifies express rate adjustments hospitals would receive pursuant to the terms of their contracts with DHCS. (See MPI at 13:16-23.) Plaintiff also submits evidence that implied contracts between the state and non-contract hospitals will be similarly impaired. For example, one non-contract hospital estimates losses of approximately $800,000 dollars in 2011 because of the Rate Freeze; another non-contract

---

[11]   This evidence is contained in various declarations submitted by executives of contract hospitals who were involved in negotiating Medi-Cal contracts with CMAC. The court does not cite directly to these declarations as they have been sealed, as described *supra*.

hospital projects losses of approximately $900,000 dollars in 2011, $1,000,000 in 2012 and $1,100,000 in 2013. (See Larsen Decl., filed Feb. 01, 2011 [Docket #16], ¶ 11; Gordon Decl., filed Jan. 28, 2011 [Docket #15], ¶ 11.)  Therefore, the Rate Freeze both nullifies essential terms of the contracts with the State and "alters a financial term."  S. Cal. Gas Co., 336 F.3d at 890.  In sum, the impairment here goes to the fundamental terms of the contracts in question: reimbursement at the negotiated rates for services rendered to Medi-Cal beneficiaries.

    Defendants fail to adequately explain how any supplemental payments will account for these losses.  Relying on the rate study's findings, defendants emphasize that through various supplemental payments provided by statute, most hospitals will still recoup the vast majority of their costs expended in offering Medi-Cal services during the period of the Rate Freeze. The rate study's findings regarding hospital costs and the reasonableness of the State's payment rates, however, are not pertinent to the court's determination of "substantial impairment" for purposes of the Contract Clause.  Unlike the inquiry under Section 30(A), discussed infra (where the court must evaluate whether defendants considered responsible cost studies prior to setting provider compensation rates), here, the court must determine whether the State's action in implementing a rate freeze nullifies an essential financial term of the State's pending contracts.  As set forth above, plaintiff has clearly demonstrated that the Rate Freeze impairs essential financial terms of Medi-Cal hospitals' contracts with the State--namely, the rate at which those hospitals are reimbursed for services to

22

Medi-Cal beneficiaries.

Moreover, contrary to defendants' assertions, the *temporary* nature of the Rate Freeze does not counteract the drastic monetary losses hospitals offering Medi-Cal services stand to suffer. Finally, the fact that the State heavily regulates Medi-Cal does not lead to the conclusion, as defendants urge, that the Rate Freeze does not substantially impair the State's contracts with Medi-Cal participating hospitals. Courts have made clear that: "The set of expectations defined by heavy regulation does not and cannot include the expectation that a state will retroactively abrogate its contracts in violation of the contracts clause." <u>Caritas Services, Inc. v. Dep't of Soc. & Health Servs.</u>, 869 P.2d 28, 36 (Wash. 1994).

Since plaintiff has shown a reasonable likelihood of demonstrating that the Rate Freeze will nullify the State's essential contractual obligations to reimburse hospitals offering services to Medi-Cal beneficiaries, the court finds the freeze substantially impairs those hospitals' contracts with the State.

### b.  Reasonable and Necessary Exercise of Police Power

Defendants contend that the Rate Freeze is necessary and proper to facilitate the implementation of the new DRG-based methodology, which defendants assert will provide "a more efficient health care system." (<u>Id.</u> at 4:12-19.) More specifically, defendants argue that: (1) the Rate Freeze is necessary because DHCS needs static rate reimbursement data to properly set DRG payment weights (Opp'n at 7:3); (2) the Rate Freeze is necessary to ensure the integrity of the DRG weight-setting process (<u>Id.</u> at 7:18-21); (3) without the freeze,

hospitals participating in the SPCP program may improperly obtain confidential information they can use to their own advantage in discussions regarding DRG payment weights and policy adjustments (Id. at 7:22-8:1); and (4) permitting "hospitals to renegotiate their contract rates during the 'variance[12] determination process' will skew the data on which the variance, if any, will be based" (Id. at 8:2-9). Defendants bear the burden of making a sufficient showing that the contractual impairment imposed by the Rate Freeze is both reasonable and necessary. See Cayetano, 183 F.3d at 1106. Significantly, defendants do not assert that the DRG-based system cannot be implemented without freezing reimbursement rates.

### 1.    Important Governmental Purpose

In order to withstand a claim under the Contract Clause, the state must show that impairment of the contract in question is necessary to achieve an important governmental purpose. State of Nevada Emps. Ass'n, 903 F.2d at 1226. The impairment is not necessary if there is another, more moderate course of action that would permit the state to implement the DRG-based methodology. See Cayetano, 183 F.3d at 1107.

---

[12]    "The limit on the amount that the new DRG reimbursement can vary from current payments would be known as a 'variance cap.'" (Sands Decl. ¶ 14.) A variance cap would be implemented in order to ensure that reimbursement rates under the DRG system will not vary from current rates by more than a pre-determined percentage." (Id.) "DHCS will determine the exact percentage, or whether or not to use the variance cap at all, by comparing the difference between existing rates for all contract and non-contract hospitals against their projected DRG reimbursement. For example, if it is determined that there are large differences between existing rates and the DRG reimbursement, DHCS may impose a lower variance percentage to limit the impact on hospitals." (Id.)

1    Defendants have not cited any authority directly supporting
2    their contention that the implementation of the DRG methodology
3    constitutes an important state interest that justifies impairing
4    state contracts with Medi-Cal participating hospitals.
5    Defendants cite to <u>Keystone Bituminous Coal Ass'n v.</u>
6    <u>DeBenedictis</u>, 480 U.S. 470, 472 (1986) for their contention that
7    the Rate Freeze is a "valid exercise of the State's police power
8    to protect the public health and welfare." <u>Keystone</u>, however, is
9    inapposite.

10    In <u>Keystone</u>, the Court upheld a regulation requiring that 50
11    percent of coal beneath certain structures be kept in place to
12    provide surface support. <u>Id.</u> at 504.  The Supreme Court held
13    that, even though the state action clearly impaired a private
14    contract, it did not violate the Contract Clause since the state
15    was not a contracting party, and the Court deferred to the
16    state's "strong public interest in preventing this type of harm,
17    the environmental effect of which transcends any private
18    agreement . . . ."  <u>Id.</u> at 505.  The Court emphasized that
19    without the regulation in <u>Keystone</u>, the "mining operations . . .
20    would make shambles of all [the] buildings and cemeteries."  <u>Id.</u>

21    Such an immediate and direct threat of harm is not present
22    in this instance; indeed, the State has operated its Medicaid
23    program effectively under its current reimbursement methodology
24    for years.  Moreover, the court will not defer to the State's
25    judgment in this instance because it is impairing a public
26    contract in its own self interest: the "state cannot refuse to
27    meet its legitimate financial obligations simply because it would
28    prefer to spend the money to promote the public good rather than

25

the private welfare of its creditors." United States Trust Co.,
431 U.S. at 29.

The court finds defendants' contention that the Legislature
passed the Rate Freeze solely for purposes of easing the
transition to the DRG-based reimbursement methodology dubious.
In fact, the preliminary notice issued by DHCS did not mention
the DRG methodology; instead, it stated that the Rate Freeze was
necessary to "generate savings to the State General Fund and
operations efficiencies" and "contribute to reducing and
stabilizing the payments to hospitals for impatient services."
(RJN, Ex. B.)  Neither the Legislature nor DHCS offered the DRG-
based methodology as a basis for this legislation until *the day*
*before* the legislation passed.  (See Raymond Decl. Ex. B at 2,
8-37.)  It thus appears that, from the outset, the consistently
declared purpose behind the proposed rate freeze was purely
budgetary until a last minute rationale was proffered.

Importantly, if the Rate Freeze was enacted solely to
facilitate the transition to the DRG-based system, rolling the
rates back to January 1, 2010, would not be necessary.  Indeed,
DHCS could simply freeze the rates on the date the new DRG-based
methodology is implemented.  In other words, if the Rate Freeze
was meant only to facilitate the implementation of the DRG-based
methodology, it would not be necessary to *retroactively* freeze
rates to January, 2010.  In the court's view, rolling back rates
to January 2010, was obviously done to save the State money in
the form of its Medi-Cal obligations.  Budget concerns, however,
cannot justify a state's impairment of its own contracts.  See
United States Trust Co., 431 U.S. at 25—26; Caritas Services, 869

26

P.2d at 40 ("Financial necessity, though superficially compelling, has never been sufficient to itself permit states to abrogate contracts." (internal quotations and citations omitted)).

Accordingly, the court finds that defendants have not identified an important governmental purpose sufficient to justify impairment of its contracts with plaintiff's member hospitals.

### 2.   Necessity of Rate Freeze

Moreover, even if the court found that implementation of the DRG system constituted an important governmental purpose, defendants have failed to carry their heavy burden of demonstrating that the Rate Freeze is necessary to implement that system. Here, defendants cannot--nor have they attempted to-- demonstrate that the DRG system cannot be implemented without freezing reimbursement rates. Instead, defendants' arguments suggest that the Rate Freeze may make implementation of the new DRG methodology more convenient. Mere convenience, however, is not a sufficient justification for the State to impair its own contracts--an impairment that will likely result in incalculable losses to hundreds of California hospitals that provide vital medical care to the neediest constituents of the State.

Conversely, plaintiff submits sufficient evidence to demonstrate the Rate Freeze is not necessary to implement the DRG-based system. Plaintiff proffers evidence that Medicaid programs have previously transitioned to DRG-based reimbursement methods without freezing rates. (Zaretsky Decl. ¶¶ 21-23) According to plaintiff's expert, Henry Zaretsky, DHCS "can

develop a DRG system using the most recent available data
projected to the proposed implementation year . . . and implement
the rates calculated from the projected data during the first
implemented year" without freezing reimbursement rates. (Id.
¶ 23.) While defendants, in conclusory fashion, state that the
Rate Freeze is necessary, they do not assert, let alone provide
any evidence, that DHCS could not implement the DRG-based system
in the absence of a rate freeze. Indeed, defendants only state
that "further rate changes may make the transition to an
inpatient hospital reimbursement methodology based on diagnosis-
related groups more difficult." (Id. at 6:16–18.)

        In their opposition, defendants rely primarily on the
purported need for static reimbursement rate data to set DRG
payment weights to support their contention that the Rate Freeze
is necessary to implement the DRG system. (Id. at 7:3–4.)
Defendants' assertion, however, is belied by their own
opposition, which states: "DRG weights are . . . set on average
*costs* for any particular diagnosis group." (Id. at 7:3-4.)
(emphasis added) As defendants admit and plaintiff's expert
attests, "DRG weights are based on relative costs among DRGs, not
relative payment rates;" reimbursement rates have little bearing
on actual costs. (Zaretsky Supp. Decl., filed Feb. 16, 2011
[Docket #30], Attachment 1, ¶¶ 7, 9.) ("Allowing hospitals to
continue to receive rate increases based on payment negotiations
or cost reimbursement subject to limits on rates of increase or
peer group limits in no way affects the cost and charge data that
would be used to set DRG weights."). Plaintiff has demonstrated
that static reimbursement rate data is not absolutely necessary

28

to implement the DRG system, and therefore, defendants'
contention that the Rate Freeze is necessary to set DRG weights
is unavailing.  Even if "the State wished to use Medi-Cal payment
rates to determine DRG weights, . . . [t]he State could simply
use the rates in effect on July 1, 2010, whether or not each
hospital continues to receive those rates."  (<u>Id.</u> ¶ 18.)
Moreover, if static data was truly necessary to implement the
freeze, there is no reason DHCS could not take a "snap shot" of
hospital payment data, on any date past or present, and use it
for the purpose of calculating DRG weights going forward.

     Next, defendants contend that the Rate Freeze is necessary
to ensure the integrity of the DRG weight-setting process because
"[a]llowing some hospitals . . . to continue to negotiate new
rates during the setting of the DRG payment weights creates an
atmosphere of distrust amongst the hospitals and will make it
difficult to obtain a consensus on the payment weights and policy
adjustments determinations."  (Sands Decl. ¶ 16.)  Defendants
further argue, discussions amongst hospitals during the weight-
setting process "might provide contract hospitals with
information that they could use to their own advantage to
negotiate higher existing rates with CMAC."  (<u>Id.</u>)  The court
cannot surmise how this justifies the State abrogating its
contractual responsibility to reimburse Medi-Cal participating
hospitals.  First, as previously explained, the mere fact that it
may be "difficult to obtain a consensus on the payment weights"
is not a sufficient justification for the State impairing its own
contracts.  <u>See</u> <u>State of Nevada Emps. Ass'n</u>, 903 F.2d at 1226.
Second, the court cannot see how requiring DHCS to reimburse

hospitals at rates *previously* contracted for would give hospitals any advantage in negotiating contracts with CMAC.

Defendants also contend that "allowing contract hospitals to renegotiate their contract rates during the 'variance determination process' will skew the data on which the variance, if any, will be based. (Opp'n at 8:2-3.)  The court finds this argument too attenuated to justify the State unilaterally nullifying its contractual obligations in the guise of its police power.  First, neither the statute mandating implementation of the DRG methodology nor the various notices posted by DHCS mention a "variance cap," even once. (Zaretsky Suppl. Decl. ¶ 13.)  Moreover, defendants, in their opposition, admit that a "variance cap" may not even be implemented. (Opp'n at 8:3.)  The court cannot permit the State to renege on its contractual obligations simply because the Rate Freeze will make the calculation of a hypothetical "variance cap" (which may or may not be implemented) more difficult.

Defendants have not shown that the Rate Freeze is necessary to implement the DRG-based system.

### 3.   Reasonableness of the Rate Freeze

Not only have defendants failed to demonstrate that the Rate Freeze is necessary to implement the DRG-based system, but they also cannot show it is reasonable to freeze rates in order to implement the system.  The reasonableness of the impairment must be measured against the extent of harm to the hospitals.  <u>See</u> <u>Cayetano</u>, 183 F.3d at 1107.  Given the extreme financial harm the impairment will cause to both contract and non-contract hospitals, as discussed *supra*, defendants cannot show that the

30

Rate Freeze is reasonable simply because it will make the
implementation of the DRG-based methodology more convenient.  In
this instance, it is not reasonable for the State to unilaterally
alter contractual reimbursement rate provisions in the name of
its police powers since that change will cause substantial
financial harm to those hospitals providing necessary services to
California's indigent population.

In sum, as to the Contract Clause, defendants have not
submitted sufficient evidence to demonstrate either that (1) the
Rate Freeze does not substantially impair the State's contracts
with Medi-Cal participating hospitals or that (2) the Rate Freeze
is necessary and reasonable to implement the new DRG-based
reimbursement methodology.  Therefore, the court finds that
plaintiff is likely to succeed on the merits of its Contract
Clause claims asserted under both the federal and state
Constitutions.

**2.    Section 13(A) Public Notice and Comment Requirements**

Plaintiff's fourth claim for relief asserts that the
Supremacy Clause preempts enactment of the Rate Freeze because
DHCS has failed to comply with the public notice and comment
provisions of Section 13(A).  As previously described, Section
13(A) requires that a public notice and comment procedure precede
any alteration to Medi-Cal reimbursement rates.  Section 13(A)
specifically requires: (1) publication of the proposed rates,
including the underlying methodologies and justification for the
rates; (2) a reasonable opportunity for public comment on the
proposed rates; and (3) publication of the final rates, including
the underlying methodologies and justifications for the rates.

31

42 U.S.C. § 1396a(a)(13)(A).

Plaintiff specifically alleges that the aforementioned June 24 notice did not sufficiently explain the methodology underlying the Rate Freeze and failed to justify the rate change. (MPI at 21:12-23.) Plaintiff also alleges that the five days allotted for public comment did not provide it a reasonable opportunity to comment under Section 13(A). (Id. at 21:21-23.) Defendants, however, point out that plaintiff fails to acknowledge the three other notices defendants posted either via its website or through the California Regulatory Notice Registry, as described *supra*. Each subsequent notice sufficiently described the DRG methodology as well as its justification. (See generally Sands. Decl. ¶ 19.)

Plaintiff, in its reply, contests defendants' argument that the four notices, taken together, complied with Section 13(A). Plaintiff's central argument is that it was not provided a meaningful opportunity to comment on the Rate Freeze because the majority of the notices "came after the statute already was enacted." (Pl.'s Reply, filed Feb. 16, 2011 [Docket #30], at 11:26-12:10.) Plaintiff asserts that, had the Rate Freeze and its justification "been announced earlier, CHA, and presumably many others, would have explained why a rate freeze is not necessary for the state to roll out a DRG-based reimbursement system." (Id. at 12:5-9.)

Plaintiff's contention is both factually and legally inaccurate. First, plaintiff did explain that the Rate Freeze was not necessary. On May 26, 2010, plaintiff's representative, Barbara Glaser, testified during a Senate Budget Committee hearing addressing, among other matters, the inpatient Rate Freeze.

(Hutonhill Decl. ¶ 5.)   Second, plaintiff cites no authority
supporting its implicit assertion that compliance with Section
13(A) must *precede* legislation implementing a rate change.
Indeed, a cursory review of Section 13(A) demonstrates that there
is no specific time by which a public notice concerning a change
in reimbursement methodology must issue.   Since plaintiff has
failed to demonstrate that the various notices posted by DHCS
failed to comply with Section 13(A), the court finds that
plaintiff is not likely to succeed on the merits of its fourth
claim for relief.

**3.   <u>State Plan Amendment (SPA) and Waiver Amendment Approvals</u>**

In its sixth and seventh claims for relief, plaintiff alleges
DHCS is barred from implementing the Rate Freeze because the
department has not obtained the required federal approval of the
necessary amendments to (1) the State Plan and/or (2) the State's
waiver agreement with CMS that covers the SPCP.   Defendants agree
that an approved amendment to the State Plan is necessary for DHCS
to apply the Rate Freeze to non-contract hospitals since the rates
are governed by the State Plan.   <u>See</u> 42 C.F.R. §§ 430.12, 447.252,
447.256(a)(i) (requiring that the State Plan be amended to reflect
material changes in payment methodology).   Defendants further
acknowledge that an approved amendment to the waiver agreement is
necessary for the department to apply the freeze to contract
hospitals, as the SPCP is governed by the waiver agreement.
(Keville Decl., ¶¶ 2-3; Ex. A at 9; Ex. B at 8 [the STCs mandate
that changes to the waiver program, including to "reimbursements,"
be approved by CMS before being implemented].)   Significantly,
defendants also concede that to date, DHCS has not obtained

33

approval of its SPA concerning the Rate Freeze, submitted on September 30, 2010 to CMS, nor has it received approval of any amendment to the SPCP waiver agreement.[13]   However, defendants argue plaintiff cannot prevail on these claims for relief because plaintiff has no private right of action to enforce the SPA requirements and lacks standing to challenge any waiver amendment requirements.

**a.   Federal Approval of SPAs**

First, with respect to SPAs, the Ninth Circuit has repeatedly held that even where proposed amendments to the State Plan are *submitted* for federal approval, a state Medicaid agency may not *implement* the amendments until federal approval is actually obtained.   See Exeter Memorial Hosp. Ass'n v. Belshe, 145 F.3d 1106 (9th Cir. 1998), relying on Wash. State Health Facilities Ass'n v. Washington Dep't of Soc. & Health Servs., 698 F.2d 964 (9th Cir. 1982) and Or. Ass'n of Homes for the Aging, Inc. v. State of Oregon, 5 F.3d 1239 (9th Cir. 1993).   In Exeter, a Medicaid provider brought a § 1983 action seeking a preliminary injunction to require DHCS to stop enforcement of its new Medi-Cal reimbursement rates prior to approval of a state plan amendment submitted to HHS.   The court held, reaffirming its prior holdings in Wash. State Health and Or. Ass'n of Homes, that Plan "amendments changing payment methods and standards require [prior federal] approval."   Id. at 1108 (internal citations and quotations omitted).   The court emphasized that its holding was not based on particular statutory language relating to plan

_____

[13]    It is not clear from the record that defendants have submitted an amendment with respect to the waiver agreement.

amendments but rather on the "overall statutory framework." <u>Id.</u> That framework, the court held, required that "all plans receive approval by the federal government before they may be implemented, and that all amendments to plans must also be federally approved." <u>Id.</u>  The court held that in <u>Wash. State Health</u>, it determined that from these requirements "logically flows the requirement that amendments to plans must be approved before implementation." <u>Id.</u>

Recently, this court, applying <u>Exeter</u>, concluded that a change in the Medi-Cal payment methodology for certain services provided by Rural Health Clinics and Federally-Qualified Health Centers could not be implemented without prior CMS approval; this court thus enjoined the State's implementation of Cal. Wel. & Inst. Code § 14131.10, which excluded payment for certain optional, federal medical services, until the State received CMS' approval of its SPA.  <u>CARHC</u>, 2010 WL 4069467 at *12-13.

As they did in <u>CARHC</u>, defendants preliminarily argue that plaintiff's claims fail because there is no private right of action to pursue a claim for violation of the federal requirements for SPAs.  On the merits, defendants concede this case is controlled by <u>CARHC</u>, but they ask the court to reconsider its decision.

The court considers below the issue of whether plaintiff has an enforceable right to pursue a SPA challenge, as different arguments are raised in this case than were presented in <u>CARHC</u>, and there are unique facts presented here which render the private right of action issue, in part, distinct from the issue in <u>CARHC</u>. The court will not, however, revisit the merits analysis fully addressed in <u>CARHC</u> and equally applicable here.  Defendants offer

no basis for reconsideration of the court's CARHC decision; indeed, defendants acknowledge they present their arguments on the merits merely to preserve the issues for appeal. (Opp'n at 14:11-13.)

Motions for reconsideration are "an extraordinary remedy to be used sparingly in the interests of finality and conservation of judicial resources." Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 887, 890 (9th Cir. 2000) (internal citations and quotations omitted). Thus, the Ninth Circuit has made clear that a motion for reconsideration should not be granted "'absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.'" Id. (quoting 389 Orange St. Partners v. Arnold, 179 F.3d 656, 661 (9th Cir. 1999)).

Here, defendants proffer no new evidence or new argument establishing that the court's CARHC decision was in clear error.[14] Reliance Ins. Co. v. Doctors Co., 299 F. Supp. 2d 1131, 1154 (D. Hawaii 2003) (recognizing that "[r]eiteration of arguments originally made in support of, or in opposition to, a motion . . . do not provide a valid basis for reconsideration"). Defendants' mere disagreement with the court's decision is not grounds to reconsider the order. See Blacklund v. Barnhart, 778 F.2d 1386, 1388 (9th Cir. 1985).

---

[14]   The court notes that plaintiff proffers evidence that CMS' position with respect to SPA approvals is consistent with Ninth Circuit law and this court's CARHC decision.  In an October 2010 letter to State Medicaid Directors, CMS stated: "[T]he statute and regulations require CMS to review and approve SPAs for consistency with [the Medicaid Act] *before* a State may implement Medicaid program modifications." (Keville Supp. Decl., filed Feb. 22, 2011 [Docket #33], Ex. A.)

Therefore, for defendants to prevail on the merits of plaintiff's SPA claim, the court must find that plaintiff has no cognizable right to assert the claim.  With respect to the issue of SPA approval, this court held in <u>CARHC</u> that the plaintiffs had an enforceable right, through 42 U.S.C. § 1983 ("Section 1983"),[15] to challenge the State's failure to comply with the federal SPA requirements.  2010 WL 4069467 at *12.  The "controlling law in this circuit [<u>Exeter</u>, <u>Wash. State Health</u> and <u>Or. Ass'n of Homes</u>] permits [this] very type of challenge brought by plaintiffs" under Section 1983.  <u>Id.</u>  Defendants concede this point, but argue that these cases are inapposite here because plaintiff does not bring these claims via Section 1983, but rather under the Supremacy Clause.  In its sixth claim for relief, plaintiff specifically references the Supremacy Clause, alleging:

> unless and until the Rate Freeze is approved by the federal Medicaid agency, the Rate Freeze is preempted under the Supremacy Clause because the Director cannot simultaneously comply with the provisions of California law requiring implementation of the Rate Freeze and federal law requiring amendment of the State Plan for material changes in reimbursement policy.

(Compl., ¶ 93.)[16]  Significantly, like all of its claims for relief, in its sixth claim, plaintiff incorporates by reference all previous paragraphs, which includes paragraph 1 of the

---

[15]    Section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[16]    The seventh claim for relief does not specifically reference the Supremacy Clause or Section 1983. (<u>Id.</u> at ¶¶ 94-97.)

37

complaint that alleges the action is brought pursuant to "the Supremacy Clause and 42 U.S.C. § 1983." Thus, the complaint can be read as alleging each of the claims for relief under the Supremacy Clause *and/or* Section 1983. Fed. R. Civ. P. 8. Importantly, the Ninth Circuit recognized in <u>Wash. State Health</u>, that while the plaintiffs there did not plead a claim for relief under Section 1983, "it is clear that they are properly in federal court under this provision." 698 F.2d at 965 n.4. The same is true here.

Under the court's decision in <u>CARHC</u>, plaintiff may press this action via Section 1983. 2010 WL 4069467 at *12 (finding that federal SPA approval requirements are privately enforceable in federal court under Section 1983). Defendants do not cite any authority to the contrary.

Their sole reliance on <u>Sanchez v. Johnson</u>, 416 F.3d 1051 (9th Cir. 2005) is unavailing. There, the Ninth Circuit determined that Section 30(A) did not create an individual right enforceable under Section 1983 by either a Medicaid recipient or a provider of Medicaid services. <u>Sanchez</u>, however, did not address the requirements of *SPA* approvals.[17] Indeed, Section 30(A)'s requirements are entirely different than the SPA approval

--------

[17] Because the court finds that plaintiff may privately enforce the SPA approval requirements via Section 1983, it need not consider whether such an action is likewise permitted under the Supremacy Clause. However, the court notes that for reasons similar to those in <u>Indep. Living Ctr. of S. Cal. v. Shewry</u> ("<u>ILC I</u>"), plaintiff's claims are likely also enforceable via the Supremacy Clause. The Ninth Circuit made clear in <u>ILC I</u> that a party need not demonstrate that federal law gives rise to a private right of action to state a preemption claim. 543 F.3d at 1058, 1063-64. Here, plaintiff has plead, at least, its sixth claim for relief expressly under a conflict preemption theory.

requirements.   In <u>Sanchez</u>, the Ninth Circuit emphasized that
Section 30(A) focuses on the "'methods and procedures' by which a
State can balance the often incompatible goals of 'efficiency,
economy, and quality of care' in the administration of Medicaid
services."   <u>Id.</u> at 1061 (citations omitted).   The court thus held
that Section 30(A) could not give rise to a private right of
action under Section 1983 because the statute did not speak of
*individual* rights, be they providers or recipients, but rather
only the *State's* obligation to develop "methods and procedures"
for providing services *generally*.   <u>Id.</u> at 1059-60.   To the
contrary, in <u>Exeter</u>, the Ninth Circuit made clear that the SPA
requirements derive from the overall statutory framework governing
the State's payment obligations to *providers*.   <u>See</u> <u>generally</u> 42
U.S.C. § 1396a *et seq.*; <u>Exeter</u>, 145 F.3d at 1108.   It is those
specific obligations that plaintiff here, like the plaintiffs in
<u>Or. Ass'n of Homes</u>, <u>Wash. State Health</u>, <u>Exeter</u> and <u>CARHC</u>, seeks to
enforce.   <u>Sanchez</u> is thus inapposite and does not provide grounds
to deny plaintiff's motion.

     Likewise, defendants' contention that plaintiff may not
privately enforce mere regulations is also unavailing.   The SPA
approval requirements are not purely regulatory.   <u>Exeter</u>, 145 F.3d
at 1108.   In <u>Exeter</u>, the Ninth Circuit ruled that prior federal
approval of Medi-Cal reimbursement policy changes is required
based on the "overall statutory framework . . . of the statute
relating to amendments to state plans."   <u>Id.</u>   Thus, by seeking to
hold DHCS responsible for obtaining federal approval, plaintiff is
not simply seeking to enforce federal regulations, but is seeking
to enforce requirements that are derived from the Medicaid Act

concerning state plans.

Therefore, for all the above reasons, the court finds that plaintiff is likely to succeed on the merits of its sixth claim for relief regarding SPA approvals.

**b.   Federal Approval of Waiver Agreement Amendments**

With respect to plaintiff's seventh claim for relief, defendants contend the court lacks jurisdiction over this claim which alleges a violation of law based on DHCS' failure to obtain approval of an amendment to its SPCP waiver agreement, prior to freezing rates for contract hospitals.  Defendants maintain this claim asserts simply a breach of contract action against DHCS which is barred by sovereign immunity.  Defendants are incorrect.

The Supreme Court has long recognized that "suits to enforce contracts contemplated by federal statutes may set forth federal claims and that private parties in appropriate cases may sue in federal court to enforce contractual rights created by federal statutes." <u>Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union</u>, 457 U.S. 15, 22 (1982).  Furthermore, cases involving the rights or obligations of the United States or one of its agents under a contract, entered into under authority conferred by federal statute, are governed by federal law.  <u>See</u>, <u>e.g.</u>, <u>Conille v. Sec'y of Housing & Urban Devel.</u>, 840 F.2d 105, 109 (1st Cir. 1988).  Accordingly, where the subject contract is entered into pursuant to authority conferred by a federal statute and the parties' rights derive from a federal source, federal law controls the enforcement and construction of the agreement.  Any claim related to such a contract "arises under" federal law for purposes of 28 U.S.C. § 1331.  <u>See</u> <u>Eatmon v. Bristol Steel & Iron</u>

40

Works, Inc., 769 F.2d 1503, 1508 (11th Cir. 1985).

In this case, the State's waiver agreement expressly states that it was entered into under the authority of Section 1115 of the Medicaid Act. (Keville Decl., Ex. B at 1, 4, 5, 8.) Moreover, the waiver agreement includes several provisions discussing application of federal law to the waiver program and governing the State's conduct under the waiver. (See id. at 8-9.) Indeed, some of the provisions of the waiver agreement that plaintiff seeks to enforce are express components of the enabling statute, 42 U.S.C. § 1315(d) (requiring a "meaningful" public notice and comment process and providing for ongoing federal oversight of waiver programs).

Accordingly, the statute manifests a federal mandate that states comply with the limitations imposed on Medicaid waiver programs. In turn, the State's alleged disregard of its waiver agreement with CMS presents a federal question and a federal claim by plaintiff to enforce the terms of the contract.

Furthermore, contrary to defendants' argument, since plaintiff is seeking prospective relief to enforce contractual requirements that are derived from a federal statute, the State's sovereign immunity is not implicated. DCHS cites Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984) for the proposition that "sovereign immunity bars actions against a state in the absence of waiver or consent." Under Pennhurst, a State's sovereign immunity prohibits a federal court from considering a claim that a state official violated state law in carrying out her official responsibilities or from awarding purely retroactive relief against a state official. Id. at 116-124. State sovereign

41

immunity *does not* preclude a suit against state officials for injunctive relief to prevent ongoing or threatened violations of *federal law*. See <u>Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland</u>, 535 U.S. 635, 645 (2002) (*citing* <u>Ex Parte Young</u>, 209 U.S. 123 (1908)). Thus, so long as a plaintiff's claim "alleges a violation of federal law and seeks relief properly characterized as prospective," the <u>Ex Parte Young</u> doctrine applies and state sovereign immunity is not a bar.[18] <u>Id.</u>

Accordingly, plaintiff likewise has an enforceable right to pursue its seventh claim for relief challenging the State's failure to obtain approval of an amendment to the SPCP waiver agreement concerning contract hospitals.[19]

**4.   Section 30(A) Reasonable Payment Requirements**

In its third claim for relief, plaintiff alleges the Rate Freeze violates Section 30(A) of the Medicaid Act because the Legislature enacted Section 14105.281 for purely budgetary reasons in order to achieve monetary savings for the State, and neither

---

[18]   Plaintiff's claim for a writ of mandate under California Code of Civil Procedure § 1085 ("Section 1085") similarly is not barred by sovereign immunity. Plaintiff has alleged a writ of mandate claim to force DCHS' compliance with multiple federal law requirements, including SPA approval. A writ of mandate under Section 1085 is a proper vehicle for enforcing federal law requirements. <u>See</u>, <u>e.g.</u>, <u>Cal. Hosp. Ass'n v. Maxwell-Jolly</u>, 188 Cal. App. 4th 559, 568-570 (2010). Although plaintiff is using the procedural vehicle of a writ of mandate, it is seeking to enforce federal law requirements through this cause of action and is not seeking retrospective relief. Said claim is cognizable in federal court alternatively via Section 1085.

[19]   Defendants only challenged plaintiff's seventh claim for relief on the basis of a lack of standing; they did not otherwise attack plaintiff's showing on the merits of this claim. The courts notes, however, that on the basis of its decision in <u>CARHC</u>, it also finds that plaintiff is likely to succeed on the merits of this claim.

the Legislature nor DHCS properly considered the Section 30(A)

factors of efficiency, economy, quality of care and access to

services prior to enacting the Rate Freeze.  (Compl., ¶ 83.)

Section 30(A) requires states:

> to safeguard against unnecessary utilization of such
> care and services and to assure that payments are
> consistent with efficiency, economy, and quality of care
> and are sufficient to enlist enough providers so that
> care and services are available under the plan at least
> to the extent that such care and services are available
> to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A).  As set forth above, in several cases

the Ninth Circuit has held that the State may not reduce Medi-Cal

rates based only on budgetary considerations, nor may it alter

rates without *first* considering the factors enumerated in Section

30(A) and conducting or relying on cost studies showing payments

are reasonably related to costs.  ILC II, 572 F.3d at 561-62; Cal.

Pharm. II, 596 F.3d at 1106-07.  If a Medi-Cal rate reduction

fails to comply with the Section 30(A) requirements, it is

unlawful and subject to preemption under the Supremacy Clause of

the United States Constitution.  ILC II, 572 F.3d at 561-62; Cal.

Pharm. II, 596 F.3d at 1106-07.

Defendants contend these cases were wrongly decided and

assert initially that there is no private right of action, via the

Supremacy Clause, to pursue a claim for violation of Section

30(A).  Defendants emphasize that the United States Supreme Court

has granted certiorari in ILC II and Cal. Pharm. II to decide

whether Section 30(A) is enforceable in federal court through the

Supremacy Clause.  However, the grant of certiorari does not

impact the controlling law in this circuit which is clearly ILC II

and Cal. Pharm. II.  Those cases permit the instant action and the

43

circuit court decisions are, at present, binding on this court. As such, the  court finds that plaintiff may bring a claim for violation of Section 30(A).[20]

### a. **Prudential Standing**

Acknowledging the controlling law, defendants alternatively argue that plaintiff may not press this claim because plaintiff lacks "prudential standing," as providers are not within the "zone of interests" protected by Section 30(A).  In support of this argument, defendants rely on <u>Sanchez</u>.  Again, however, <u>Sanchez</u> is inapposite to this issue.  There, the Ninth Circuit determined that Section 30(A) was not enforceable through Section 1983. <u>Sanchez</u>, 416 F.3d at 1068.  The court did not consider the issue of standing, prudential or otherwise.  Moreover, following <u>Sanchez</u>, the Ninth Circuit's decisions in <u>ILC I</u> and <u>Cal. Pharm. I</u> suggest that providers have prudential standing to enforce Section 30(A), as their interests are precisely those that the statute affects in striving to ensure access to care for Medi-Cal beneficiaries.  <u>See</u> <u>ILC I</u>, 543 F.3d at 1064-65; <u>Cal. Pharm. I</u>, 563 F.3d at 852-53.  Indeed, Section 30(A) establishes standards by which states must set provider payment rates, requiring that states set rates which are reasonably related to provider costs.

_____

[20]    Additionally, the court notes that one California appellate court has determined that Section 30(A) is enforceable by hospitals through a writ of mandate proceeding under Section 1085 regardless of whether there is a federal right of action. <u>See</u> <u>Cal. Hosp. Ass'n</u>, 188 Cal. App. 4th at 569-71.  Here, plaintiff alternatively alleges a claim under Section 1085. (Compl., ¶¶ 98-108.)  Therefore, irrespective of whether there is a federal right of action to enforce Medicaid Act provisions under the Supremacy Clause, this court can enforce Section 30(A) pursuant to plaintiff's ancillary state law claim under Section 1085.  For the same reasons as set forth above, that claim is not barred by principles of sovereign immunity.

While the Ninth Circuit did not squarely address prudential standing in these decisions, its holdings finding Section 30(A) enforceable through the Supremacy Clause also support a finding of prudential standing.

Moreover, a California court of appeal recognized in <u>Cal. Hosp. Ass'n</u>, 188 Cal. App. 4th at 580, that CHA had standing to pursue a claim for violation of Section 30(A) under Section 1085. Section 1085 required that plaintiff be a "beneficially interested party"--a standard akin to the "zone of interests" test of prudential standing.  <u>Id.</u>  The court held that CHA met that standard because "it has an interest in challenging the amendments to the state plan and enforcing the Medicaid Act that is above the interest held by the public at large."  <u>Id.</u>  "CHA is interested in having its members compensated for the medical services they provide in accordance with the law and rules established by Congress and the Medicaid program."  <u>Id.</u>  Therefore, the California Court of Appeal concluded that CHA had standing to enforce DCHS' duties under state and federal law.  <u>Id.</u>  For all of the above reasons, this court finds the same here.

### b.   Compliance with Statutory Mandates

Despite the court's finding of standing, plaintiff has not shown that defendants failed to comply with Section 30(A)'s statutory mandates.  Plaintiff's reliance on <u>ILC II</u> and <u>Cal. Pharm. II</u> is unavailing.  This case is factually distinguishable from those cases.  Unlike in <u>ILC II</u> and <u>Cal. Pharm. II</u>, here, the statute vests discretion in the Director of DHCS to implement or revise the Rate Freeze as necessary to comply with federal Medicaid requirements.  Cal. Wel. & Inst. Code § 14105.281(i)(3)

45

("To the extent that the director determines the rates do not comply with the federal Medicaid requirements, the director retains the discretion not to implement the rate and may revise the rate as necessary to comply with federal Medicaid requirements.")

Here, DHCS was required to consider Section 30(A)'s mandates *before* the Director implemented the statute.  <u>Cal. Pharm. II</u>, 596 F.3d at 1107 (holding that the "final body responsible for setting Medicaid reimbursement rates must study the impact of the contemplated rate reduction on the statutory factors of efficiency, economy, quality of care, and access to care *prior to* setting or adjusting payment rates").[21]  By conducting the January 2011 rate study before implementing the Rate Freeze, the Director complied with this requirement.  This sequence further distinguishes this case from <u>ILC II</u> and <u>Cal. Pharm. II</u>, where the State failed to conduct its own study or consider other relevant rate studies before implementing the statutes.

To comply with Section 30(A)'s requirements, the Ninth Circuit has emphasized that DHCS "need not follow a rigid formula," but it must rely on something other than purely budgetary reasons for its rate setting.  <u>Orthopaedic Hosp.</u>, 103 F.3d at 1498.  "[T]he Department must consider [providers'] costs based on reliable information when setting reimbursement rates." <u>Id.</u> at 1499.  However, in doing so, neither Section 30(A) nor the

---

[21]   In <u>Cal. Pharm. II</u>, the statute at issue did not "clearly invest the director with the discretion not to implement" the rate reduction.  596 F.3d at 1111.  In this case, Section 14105.281 unequivocally grants such discretion.  Cal. Wel. & Inst. Code § 14105.281(i).

1  case law interpreting the statute impose "any prescribed method of
2  analyzing and considering [the § 30(A)] factors." <u>Cal. Pharm. II</u>,
3  596 F.3d 1107.  Ultimately, "Congress intended payments to be
4  flexible within a range; payments should be no higher than what is
5  required to provide efficient and economical care, but still high
6  enough to provide for quality care and to ensure access to
7  services." <u>Orthopaedic Hosp.</u>, 103 F.3d at 1497.

8      To prove a violation of Section 30(A), plaintiff must
9  demonstrate that the State acted in an arbitrary and capricious
10  manner.  <u>Id.</u> at 1500.  In assessing plaintiff's showing, the court
11  must determine whether defendants considered the relevant factors
12  and whether there is a reasonable relationship between the factors
13  considered and the decision that was made.  <u>Id.</u>

14      Here, plaintiff has not shown that defendants' rate study
15  fails to comply with the statutory requirements.  Plaintiff's
16  primary objection to the study is that it improperly relies on
17  certain supplemental payments to hospitals which, as of December
18  31, 2010, are no longer in effect (AB 1383 payments).  Plaintiff's
19  argument is not compelling.  The rate study considers hospital
20  costs both *with* various supplemental payments provided by law
21  (including many such payments which remain in effect) and *without*
22  *any* supplemental reimbursements.  Significantly, plaintiff offers
23  no evidence to challenge the sufficiency of the study's findings
24  with respect to providers' costs when supplemental reimbursements
25  are not considered.

26      Without these additional reimbursements, the study finds for
27  a two-year period of the freeze, with respect to non-contract
28  hospitals, that "the estimated final frozen reimbursement will

47

compensate between 88% and 98% of each hospitals' audited allowable costs for state fiscal year 2010/2011 and between 83% and 92% of each hospitals' audited allowable costs for state fiscal year 2011/2012." (Douglas Decl., Ex. A at 14.) In the aggregate, the study concludes the estimated final Medi-Cal frozen reimbursement will compensate 92% of all hospital audited allowable costs for state fiscal year 2010/2011 and 86% for state fiscal year 2011/2012, without considering any supplemental payments. (Id.) As for contract hospitals, for fiscal year 2010/2011, again without considering any supplemental payments, the study finds that 104 of 173 contract hospitals will be compensated at least 100% of their costs, 121 of 173 contract hospitals will be compensated at least 90% of their costs, and 138 of 173 contract hospitals will be compensated at least 80% of their costs. (Id. at 15.) For 2011/2012, the study concludes that 97 of 173 contract hospitals will be compensated at least 100% of their costs, 115 of 173 hospitals will be compensated at least 90% of their costs, and 133 of 173 contract hospitals will be compensated at least 80% of their costs. (Id.) The study concludes these percentages fall well above the range of reasonableness deemed acceptable by controlling Ninth Circuit law. (Id. at 14-15.)[22]

The court agrees. Prior to Orthopaedic Hosp., federal courts applied a "range of reasonableness" concept in determining if rates complied with the now repealed Boren Amendment and typically found that rates complied if they compensated in the aggregate 85%

---

[22]   When supplemental payments are considered, AB 1383 payments and others, all of these percentages are even higher.

to 95% of provider costs.  See Folden v. Wash. State Dep't of Soc.
& Health Servs., 744 F. Supp. 1507 (W.D. Wash. 1990), aff'd, 981
F.2d 1054 (9th Cir. 1992).  Under Orthopaedic Hosp., the standard
is more flexible than the Boren Amendment, requiring only that
rates "bear a reasonable relationship" to an efficient and
economical provider's costs.  103 F.3d at 1499 (recognizing that
the requirements of Section 30(A) are "more flexible than [under]
the Boren Amendment").

     Plaintiff offers no argument, let alone evidence, that
defendants' study fails to meet this standard.  Indeed, at oral
argument, plaintiff's counsel did not argue that these percentages
were legally insufficient to meet Section 30(A)'s requirements.
Instead, counsel focused only on the issue of the study's
consideration of supplemental payments, ignoring that the study
also provided an analysis of payments under the freeze, without
any supplemental reimbursement.  As such, the court cannot find
that plaintiff is likely to succeed in demonstrating that
defendants acted arbitrarily and capriciously in implementing the
statute based on its rate study.[23]

---

[23]    In a conclusory manner in its reply, plaintiff also
objects to the study arguing its "across-the-board" freeze does
not account for each hospital's relevant efficiency based on a
hospital's unique characteristics (rural vs. urban location, mix
of cases, etc.), and the study fails to adequately explain the
differences in expected payments between hospitals (the study
concludes that some hospitals will receive nearly 100% of its
costs but others less).  Plaintiff cites no law or evidence in
support of these bald objections.  None of plaintiff's experts
substantiate a basis for these arguments, nor does plaintiff
cite, or is the court aware, of any legal authority mandating
that a rate study provide this analysis.  Accordingly, the court
likewise cannot find a likelihood of success on this claim based
on these theories.

**5.** __Application of Doctrine of Primary Jurisdiction__

With respect to plaintiff's SPA approval and Section 30(A) claims, defendants alternatively argue this court should exercise its discretion under the doctrine of primary jurisdiction and defer the decision, regarding SPA and Section 30(A) compliance, to the agency charged with determining whether the Rate Freeze comports with federal SPA approval requirements and Section 30(A). Defendants maintain that under the doctrine of primary jurisdiction, this court should properly "refer to the Secretary of HHS (i.e. CMS) the issue of whether the implementation of the rate freeze in Section 14105.281 is consistent with, not only, Section 30(A), but also to determine compliance with the SPA approval process."   (Opp'n at 20:19-24.)

Primary jurisdiction may apply where "a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." Clark v. Time Warner Cable, 523 F.3d 1110, 1114 (9th Cir. 2008).   The doctrine, however, "does not require that all claims within an agency's purview be decided by the agency." Brown v. MCI Worldcom Network Servs., Inc., 277 F.3d 1166, 1172 (9th Cir. 2002).   Instead, the doctrine is only properly invoked when a claim "requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." Id.

50

Defendants' argument misses the mark.[24]  First, the fact that numerous federal cases have decided Section 30(A) and SPA approval claims is evidence in and of itself that this is not "an issue of first impression."  Id.  Any court may raise the primary jurisdiction doctrine *sua sponte*.  Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc., 307 F.3d 775, 780 n.2 (9th Cir. 2002). Yet, none of the federal courts that have heard Section 30(A) and SPA approval claims have raised the primary jurisdiction issue in this context, which demonstrates that resolution of these claims does not "require[] resolution of a particularly complicated issue."  Brown, 277 F.3d at 1172.  Defendants' argument is further vitiated by the fact that the Ninth Circuit has expressly held that private litigants may "bring suit directly under the supremacy clause to enjoin a state law allegedly preempted by federal law."  ILC II, 572 F.3d at 649 (citing Indep. Living Ctr. v. Shewry, 543 F.3d 1050 (9th Cir. 2008)); see also Orthopeadic Hosp., 103 F.3d 1491.

Plaintiff's SPA federal approval claim does not present particularly complicated issues that should be decided by CMS; defendants freely admit that they have not yet received approval of an amendment to the State Plan.  (See Sands Decl. ¶ 24.)  As described above, numerous courts, including this one, have already determined that an SPA must be approved prior to implementation.

---

[24]   As a preliminary matter, defendants' primary jurisdiction argument is essentially moot as it pertains to this motion for preliminary injunction since the court has already determined that plaintiff is likely to succeed on the merits of its Contract Clause claim, and thus, a preliminary injunction is proper.  Nevertheless, the court addresses the primary jurisdiction argument in the context of SPA approval requirements and Section 30(A) for the sake of completeness.

see <u>Exeter</u>, 145 F.3d at 1106; <u>CARHC</u>, 2010 WL 4069467.  This court can rely on those cases without any determination from CMS regarding whether prior SPA approval is required.  Similarly, the court can readily rely on those cases previously described in connection with plaintiff's Section 30(A) claims to decide plaintiff's claims regarding that statute.

In sum, this court is not, in deciding this action, infringing upon a decision that should rightfully be deferred to CMS; instead, this court, relying on a substantial body of case law, is simply deciding whether a preliminary injunction should issue, preventing DHCS from implementing the Rate Freeze until CMS determines whether the Rate Freeze in fact complies with the Federal Medicaid Act.  Therefore, the doctrine of primary jurisdiction is inapplicable to this motion for preliminary injunction.

**6.    <u>Irreparable Harm</u>**

As an association of Medi-Cal providers, plaintiff can show a likelihood of irreparable harm by establishing that its members "will lose considerable revenue through the reduction in payments that [the members] will be unable to recover due to the State's Eleventh Amendment sovereign immunity." <u>Cal. Pharm. II</u>, 596 F.3d at 1113-14.  In <u>Cal. Pharm. I</u>, the Ninth Circuit recognized that notwithstanding the general rule that monetary harm is not irreparable (as such harm is compensable through an action at law for damages), pecuniary harm may constitute irreparable injury if the plaintiff cannot recover damages from the defendant because the retroactive monetary claim is barred by the Eleventh Amendment.  563 F.3d at 851-52.

As required by <u>Cal. Pharm. I</u>, plaintiff has demonstrated that its members' Medi-Cal payments will be significantly reduced by the Rate Freeze.  In the hospitals' declarations submitted by plaintiff, several of plaintiff's members are each projecting monetary losses resulting from the Rate Freeze of millions of dollars, and in some cases, tens of millions of dollars.  (<u>See</u> re: Contract Hospitals [*filed under seal*]: Allen Decl.; Bales Decl.; Pascuzzi Decl.; Prunchunas Decl.; Walter Decl.; re: Non-Contract Hospitals: Larson Decl. ¶ 11; Gordon Decl. ¶ 11.)  These financial losses are not recoverable by an action for damages against the State.  <u>ILC II</u>, 572 F.3d at 660 (recognizing that any such damages action is barred by the Eleventh Amendment which precludes suits in federal court against states or their subdivisions for money damages).

Ignoring the consequences of Eleventh Amendment immunity, defendants simply argue the rate study's findings demonstrate that plaintiff's members will not suffer "significant" financial losses since supplemental payments will ensure that the hospitals in some cases will receive nearly 100% of their costs during the Rate Freeze.  (Opp'n at 23.)  Defendants' argument does not address the issue of irreparable harm.  Supplemental payments are immaterial to the irreparable harm analysis.  The critical question is whether a provider's contractual payments will be unilaterally impaired. <u>Cal. Pharm. I</u>, 563 F.3d at 851; <u>ILC I</u>, 543 F.3d at 1085.

As plaintiff has submitted undisputed evidence of such unilateral impairment, irreparable harm has been demonstrated. Plaintiff's members have no legal remedy to recoup such financial losses caused by the Rate Freeze, and thus, preliminary injunctive

relief is warranted.  <u>Cal. Pharm. II</u>, 596 F.3d at 1113-14.

Defendants alternatively argue that plaintiff unduly delayed bringing the motion for a TRO and preliminary injunction, and the delay supports denial of the motion, as it implies a lack of urgency and irreparable harm.  <u>See</u> <u>Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.</u>, 762 F.2d 1374, 1377 (9th Cir. 1985).  The court does not agree.  Contrary to defendants' arguments, plaintiff did not delay bringing this action.  The statute was enacted in October 2010 but DHCS did not implement it until January 2011.  More specifically, DHCS first provided notice of the department's intention to implement the statute on January 18, 2011.  That notice, posted on the department's public website, explained how the Rate Freeze would be implemented, and stated that both interim payments and final cost reimbursement would be impacted.  The notice reiterated that the Rate Freeze nullifies any rate increase that contract hospitals negotiated under the SPCP prior to July 1, 2010.  (Sand Decl. ¶ 19, Ex. D.)  The notice stated that the freeze would start impacting Medi-Cal reimbursement for hospital claims processed after January 31, 2011.  <u>Id.</u>

Plaintiff promptly moved this court for a TRO on January 27, 2011, only 9 days after the department's notice regarding *implementation* of the statute and prior to the department's actual date of implementation, January 31.  Defendants' argument that plaintiff unduly delayed pursuing this action is without merit and supplies no basis for denial of the injunction.

In sum, because plaintiff's members will lose state contractual revenue that they will unable to recover due to the

54

state's Eleventh Amendment immunity, plaintiff has demonstrated
irreparable harm sufficient to warrant issuance of a preliminary
injunction.

**7.    <u>Balance of Equities and the Public Interest</u>**

In deciding whether to grant a preliminary injunction, the
court must consider the equities as between the parties to the
action, as well as consider whether there exists "'some critical
public interest that would be injured by the grant of preliminary
relief.'" <u>ILC II</u>, 572 F.3d at 659 (*quoting* <u>Hybritech Inc. v.
Abbott Labs.</u>, 849 F.2d 1446, 1458 (Fed. Cir. 1988)).  Here,
defendants cite the need to ease the transition to the DRG payment
system and the State's budget difficulties as factors supporting
denial of the motion.  Neither argument is compelling.

First, the court does not find implementation of the DRG-
based payment system a sufficient justification to deny plaintiff
an injunction.  While defendants proffer evidence describing the
benefits of such a system for the State, those benefits are not
lost if an injunction issues.  Indeed, at oral argument,
defendants' counsel conceded that the State will likely proceed
with implementation of the DRG system even if the court enjoins
the Rate Freeze.  Moreover, plaintiff submits compelling evidence
that the system *can* be implemented without the Rate Freeze.
Ultimately, any purported, increased difficulty in implementing
the system without the Rate Freeze must be balanced against the
public's "robust public interest in safeguarding access to health
care [for Medicaid recipients], whom Congress has recognized as
the most needy in the county." <u>Id.</u> (internal quotations and
citations omitted).  The Ninth Circuit has repeatedly found that

55

the latter interest is paramount in this social welfare context. <u>Cal. Pharm. I</u>, 563 F.3d at 852-53; <u>Cal. Pharm. II</u>, 596 F.3d at 1114-15.

Second, the court acknowledges, and does not doubt, the severity of the fiscal challenges facing the State of California, but "State budgetary concerns cannot . . . be the conclusive factor in decisions *regarding Medicaid*." <u>ILC II</u>, 572 F.3d at 659 (internal quotations and citations omitted) (emphasis added).  In <u>ILC II</u>, the Ninth Circuit held:  "A budget crisis does not excuse ongoing violations of federal law, particularly when there are no adequate remedies available other than an injunction." <u>Id.</u>  Such is precisely the case here where plaintiff has no legal remedy in the face of California's unilateral abrogation of its own contractual obligations.

Therefore, the court finds that the balance of hardships and the public interest weigh in favor of enjoining the State's implementation of the Rate Freeze as contemplated by Section 14105.281.

**8.   <u>Nature of Remedy Ordered</u>**

According to defendants, should an injunction issue, this court cannot grant any retroactive relief for monetary compensation against the State.  (Opp'n at 25:6-8.)  Specifically, defendants contend that any relief can only "apply to services rendered after the date of the Court's order."  (<u>Id.</u> at 12-13.)  Therefore, defendants assert, this court cannot force the State to pay at the non-frozen rate for any Medi-Cal services rendered prior to the issuance of this preliminary injunction.

1    Plaintiff contests defendants' assertion, arguing that
2  requiring the State to pay Medi-Cal providers at the non-frozen
3  rate for services provided prior to issuance of the injunction
4  constitutes prospective relief, and thus, is not barred by the
5  Eleventh Amendment.  (Pl.'s Reply at 14:12-25.)  Specifically,
6  plaintiff contends that, since the Rate Freeze was not technically
7  implemented until DHCS determined that the rate freeze did not
8  violate federal law on January 18, 2011, "[t]he [S]tate's
9  liability for services prior to January 18, 2011 . . . accrued at
10 pre-freeze levels."  (Id. at 14:17-19.)  Therefore, according to
11 plaintiff, "[p]reventing the director from recovering payments
12 made at the rates in effect when the services were rendered would
13 not violate the Eleventh Amendment."  (Id. at 18-19.)

14    "The doctrine of state sovereign immunity generally prohibits
15 damage suits against states in both state and federal courts
16 without their consent."  ILC II, 572 F.3d at 660.  In issuing an
17 injunction against the State, courts are prohibited from granting
18 retroactive relief that would require the state, essentially, to
19 pay damages in the form of Medi-Cal reimbursement at the non-
20 frozen rates.  Id.  In the Medicaid context, determining whether
21 relief is prospective or retroactive depends on the date of
22 service, not the date of payment.  Id. at 660-661.

23    ILC II is particularly instructive on this issue.  In ILC II,
24 Medi-Cal providers sought to enjoin DHCS from implementing
25 legislation requiring a 10% reduction in rates paid to Medi-Cal
26 participating hospitals.  Id. at 649.  On August 18, 2008, the
27 district court granted the injunction, enjoining enforcement of
28 the rate reduction.  Id. at 650.  Upon subsequent motion by DHCS,

57

the court amended the order, clarifying that the "injunction should apply only to payments for services provided on or after August 18, because requiring full reimbursement for services provided prior to the court's [August 18] order would violate the State's Eleventh Amendment sovereign immunity." Id. at 650. Specifically, the August 18, 2008, order improperly granted retroactive relief because it essentially required the State to pay damages in the form of reimbursement at the pre-reduction rates for Medi-Cal services rendered prior to the issuance of the injunction. Id. at 660-61.

The explanation of retroactivity in ILC II[25] is directly applicable here: "an order enjoining payment reductions for services that had been delivered before August 18 services is . . . retroactive, even if [DHCS] had not yet tendered payment." Id. at 661 n.19.[26] Similarly, here, an order enjoining DHCS from

---

[25]   Plaintiff attempts to distinguish ILC II by arguing that since the "state's liability for services prior to January 28, 2011 . . . accrued at pre-freeze levels," it would not be retroactive to prevent "the Director from recovering payments made at the rates in effect when the services were rendered." (Reply at 14:7-19.)  Plaintiff's argument, however, appears to the court to be essentially moot as defendants never suggest that they wish to recapture payments already made.  Indeed, if defendants in fact wished to do so, sovereign immunity would not bar this court from preventing that conduct since the relief would be prospective.  What this court cannot do, however, is enjoin defendants from reimbursing Medi-Cal hospitals at the frozen rates for services rendered prior to the date of this injunction, even when payment has not already been tendered.

[26]   In ILC II, the court, for reasons that are inapplicable to the sovereign immunity issue in this case, held that the August 18 order should have applied retroactively.  Id. at 663. This is because this action was originally filed in California state court, where "an action seeking injunctive relief that requires a state official to disburse funds is not an action against the state."  Id. at 662.  Since DHCS "enjoyed no sovereign immunity in state court against a[n] order directing payment of retroactive benefits, it follows that [DHCS]--by

1 reimbursing Medi-Cal hospitals at frozen rates for services
2 rendered prior to the date of the injunction would be retroactive
3 and violate the State's sovereign immunity.  While plaintiff's
4 argument is novel, its "'attempt to characterize its claim as one
5 for prospective relief fail[s] to avoid the bar of the Eleventh
6 Amendment.'"  Id. at 660 (quoting Native Vill. of Noatak v.
7 Blatchford, 38 F.3d 1505, 1512 (9th Cir. 1994)).

**9.  Bond**

9      The court waives the bond requirement set forth in Federal
10 Rule of Civil Procedure 65(c).  In similar contexts, courts have
11 recognized the propriety of waiving the bond requirement where, as
12 here, Medicaid providers bring suit to enforce important federal
13 and public interests.  See, e.g., Pharm. Soc. of State of New
14 York, Inc. v. New York State Dep't of Soc. Servs., 50 F.3d 1168,
15 1174-75 (2d Cir. 1995); Temple Univ. v. White, 941 F.2d 201, 220
16 (3d Cir. 1991).  Further, as a result of the parties' ongoing
17 financial relationships, the bond requirement is also properly
18 waived since defendants are capable of recouping any costs or
19 damages resulting from the wrongful issuance of the injunction.
20 See e.g. United States v. Bedford Assocs., 618 F.2d 904, 916-17
21 (2nd Cir. 1980) (holding that where the defendant is able to
22 receive compensation for costs or damages, resulting from the
23 wrongful issuance of the injunction, by virtue of amounts it owes
24 the plaintiff through the parties' ongoing financial relationship,
25 no security is required).

27 removing the case to federal court--waived sovereign immunity in
that forum as well."  Id.  Since this case did not originate in
California state court, this portion of the ILC II decision is
28 inapplicable to this case.

Moreover, the court notes that defendants have not requested that plaintiff post a bond.

Accordingly, the court issues the injunction below, waiving the bond requirement of Rule 65(c).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction is GRANTED as follows:

The court hereby orders defendants DHCS and the Director thereof and his agents, servants, employees, attorneys, successors, and all those working in concert with defendants to refrain from enforcing Cal. Welf. & Inst. Code § 14105.281, including refraining from freezing rates paid to both contract and non-contract hospitals providing services to Medi-Cal beneficiaries for inpatient services provided on or after the issuance of this injunction.

At oral argument, defendants made an oral motion, should the court issue an injunction, for a stay of the injunction pending defendants' appeal of the court's order. Plaintiff opposed the motion. The court directs defendants to file a written motion for the same pursuant to Federal Rule of Civil Procedure 62(c). The court will consider the motion on an expedited briefing schedule. Defendants shall file their motion on or before March 10, 2011; plaintiff's opposition thereto shall be filed on or before March 15, 2011; and defendants may file a reply on or before March 17, 2011. If after review of the parties' briefing, the court finds that a hearing is necessary, it will promptly set a hearing date by Minute Order.

The court requests that the parties specifically address in their briefs the status of federal approvals of the State's SPA and any waiver agreement amendments.

IT IS SO ORDERED.

DATED: March 4, 2011

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

61